# In the United States Court of Federal Claims

No. 26-561C
(Filed Under Seal: July 30, 2026)
(Reissued: September 22, 2026)*
**FOR PUBLICATION**

| | |
|---|---|
| MVL USA INC., | |
| Plaintiff, | |
| v. | |
| THE UNITED STATES, | |
| Defendant, | |
| and | |
| AL GHANIM COMBINED GROUP CO. GEN. TRAD. & CONT. WLL | |
| Defendant-Intervenor. | |

*Joseph L. Cohen*, Burr & Forman LLP, Chicago, IL, for Plaintiff. With him were *Kelsey M. Hayes* and *Chase Bullock*, Burr & Forman LLP, Chicago, IL.

*Margaret J. Jantzen*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for Defendant. With her were *Brett A. Shumate*, Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Geoffrey M. Long*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C.

*Sam Gdanski*, Gdanski Law PC, Teaneck, NJ, for Defendant-Intervenor. With him was *Abraham Gdanski*, Gdanski Law PC, Teaneck, NJ.

## OPINION AND ORDER

In this bid protest, MVL USA Inc. ("MVL") challenges an award to intervenor Al Ghanim Combined Group ("AGCO"). *See* Compl. (ECF 1). The parties' cross-

motions for judgment on the administrative record are fully briefed, and I have heard oral argument.[1]

MVL raises a profusion of issues — more than a dozen, depending on how one counts. Many of them are untimely and forfeited; others fight the deferential standard of review; others contradict the factual record. But one sticks to the proverbial wall. MVL's Motion for Judgment on the Administrative Record is therefore **GRANTED**, and the government's and AGCO's motions are **DENIED**. AGCO's original cross-motion is **DENIED AS MOOT**. The case is **REMANDED** for further proceedings. The government is **ENJOINED** from actions inconsistent with this Opinion, as specified below.

## BACKGROUND

### I. The Solicitation

The Army Corps of Engineers ("Agency") issued Solicitation No. W5J9JE25R0003 ("Solicitation"), seeking construction, maintenance, and related services at facilities in Kuwait. AR 973–1003.[2] The Solicitation contemplated a single indefinite delivery, indefinite quantity job-order contract, under which the awardee would receive task orders for individual projects. AR 40, 113.

---

[*] Pursuant to the protective order in this case, the Court initially filed this opinion under seal on July 30, 2026, for the parties to propose redactions of confidential or proprietary information. *See* Sealed Opinion (ECF 54); Protective Order (ECF 11). The parties were directed to propose redactions to the opinion and sealed transcript of the oral argument by August 13. *See* (ECF 54). On August 13, the Court received the parties' proposed redactions for the opinion. *See* (ECF 57). However, the parties failed to submit redactions to the transcript and did not justify all redactions to the opinion. *See* (ECF 57-1). On August 19, the Court issued an order giving the parties until September 2 to move for leave to file the requested materials out of time. *See* Order (ECF 58). On September 2, the Court received the parties' motion and proposed redactions to the transcript and supporting memorandum for the transcript and opinion. *See* (ECF 65); (ECF 65-1). On September 22, the Court granted the parties' motion for leave to file their proposed redactions out of time. *See* Order (ECF 66). The Court has incorporated all redactions, and marks them with bracketed ellipses ("[. . .]" below.

[1] Pl.'s Mot. for J. on the Admin. R. ("Pl.'s MJAR") (ECF 25); Def.'s Cross-Mot. for J. on the Admin. R. & Resp. ("Def.'s MJAR") (ECF 26); Def.-Intervenor's Am. Cross-Mot. for J. on the Admin. R. & Resp. ("Def.-Int.'s MJAR") (ECF 34); Pl.'s Resp. & Reply ("Pl.'s R&R") (ECF 35); Def.'s Reply (ECF 36); Def.-Intervenor's Reply (ECF 37); Oral Arg. Tr. ("Tr.") (ECF 45). Defendant-Intervenor's amended motion superseded an original motion. *See* (ECF 27). Defendant-Intervenor moved for leave to file a surreply. *See* Def.-Intervenor's Mot. for Leave (ECF 41). Despite deficiencies in the proposed surreply's timing and content, I granted Defendant-Intervenor's motion at oral argument and ordered Defendant-Intervenor to file the surreply no later than July 30, 2026. *See* Tr. at 13; Order (ECF 49). As of publication, Defendant-Intervenor has not filed the surreply. Having seen its substance, I consider it unnecessary for my decision. The parties filed supplemental letters in response to questions at argument. *See* Def.-Intervenor's Notice (ECF 50); Def.'s Ltr. (ECF 51); Pl.'s Ltr. (ECF 52).

[2] Citations are to the eighth and final amended version of the Solicitation.

The Solicitation provided three factors for evaluation of proposals: Factor 1 – Management Approach, Factor 2 – Past Performance, and Factor 3 – Coefficients and Composite Rates. AR 977, 986. Each of those factors is relevant to the present protest.

In evaluating offerors' management approaches for Factor 1, the Agency looked to whether proposals "demonstrated construction management competencies and offerors' ability to effectively allocate, manage, and control resources (personnel, equipment, and materials) across multiple concurrent projects to ensure on-time and within-budget completion." AR 977.

Each offeror had to describe, among other things, its structure and its approach to management and performance. AR 977–78. They also had to provide a chart "depicting" the organization of the offeror's personnel and subcontractors, including lines of communication and authority. AR 977, 989; *see also* AR 990 ("More weight will be given for an organizational chart that makes logical relationships and lines of communication between the contractor and subcontractors."). Proposals were to receive one of five adjectival ratings: Outstanding, Good, Acceptable, Marginal or Unacceptable. AR 985, 988–89.

Evaluation of past performance under Factor 2 was intended to "inform an overall confidence assessment regarding [offerors'] ability to meet the contract requirements." AR 979. Review centered on the offerors' submissions of relevant past projects, plus the Agency's own review of other sources including information in the Contractor Performance Assessment Reporting System ("CPARS"). AR 981. The Agency would express its confidence using, again, five adjectival ratings: Substantial Confidence, Satisfactory Confidence, Limited Confidence, No Confidence, and Unknown Confidence (Neutral). AR 986, 994.

The Agency evaluated pricing under Factor 3. Many tasks to be performed under the job-order contract were to be pre-priced using the Unit Price Book, incorporated as "part of the awarded contract." AR 998. But performance also includes other costs, including overhead, profits, and so forth. Offerors were required to tally up those costs and express them in terms of proposed "coefficients" — cost multipliers, essentially — for line items. AR 996, *see also* AR 2020. The Agency would then weight those coefficients according to a pre-set formula and combine them to reach a "Bottom Line Sum," AR 995–96, reflecting an overall multiplier for the weighted combination of pre-priced work items.

The bottom-line sum then became the reference point for the Agency's price evaluation. The Solicitation required the Agency to evaluate coefficients and pricing for completeness, balance, and "reasonableness" using the analysis set out in Federal Acquisition Regulation ("FAR") Subpart 15.305(2). AR 995.

The Solicitation required award based on the "Best Value Tradeoff Acquisition Method," with all three evaluation factors equally weighted. AR 985.

## II. Evaluation and Award

Several offerors submitted proposals, including MVL (the incumbent contractor) and AGCO. *See* AR 6228–478 (AGCO's final revised proposal); AR 8174–378 (MVL's final revised proposal). The Agency awarded the contract to AGCO, *see* AR 1948, and MVL protested in this Court, AR 2036; *see* Complaint (ECF 1), *MVL USA, Inc. v. United States*, No. 1:26-cv-64 (Fed. Cl. Jan. 15, 2026). MVL dismissed its protest without prejudice when the Agency took voluntary corrective action. *See* AR 2036; Def.'s Notice of Corrective Action (ECF 14), *MVL USA, Inc.*, No. 1:26-cv-64 (Fed. Cl. Jan. 22, 2026); Notice of Voluntary Dismissal (ECF 15), *MVL USA, Inc.*, No. 1:26-cv-64 (Fed. Cl. Jan. 23, 2026).

On re-evaluation, the Agency awarded to AGCO a second time. MVL's and AGCO's ratings were as follows. AR 2037.

| Evaluation Factor | MVL | AGCO |
| --- | --- | --- |
| Factor 1 – Management Approach | Good | Outstanding |
| Factor 2 – Past Performance | Substantial Confidence | Substantial Confidence |
| Factor 3 – Coefficients & Composite Rates | [. . .] | [. . .] |

Several aspects of the Agency's reasoning are especially relevant here.

### A. Factor 1 – Management Approach

The Agency assigned four strengths and four weaknesses to MVL. The key subjects are as follows.

#### 1. *Subcontractor communication*

One weakness related to the lack of a "communication plan" covering MVL and its subcontractors. AR 2015. MVL described its plan for performance as "subcontractor-based execution with oversight." AR 8189. The Source Selection Evaluation Board ("SSEB") stated that MVL's "fail[ure] to detail a communication plan … as required by solicitation" introduced various risks that could threaten successful performance. AR 2015.

The Source Selection Authority ("SSA") concurred. The Source Selection Decision Document ("SSDD") stated that MVL had provided all requested information "with the exception of a detailed communication plan between the offeror

and their subcontractors." AR 2046. That omission, the SSA reasoned, "compounds" risks arising from MVL's subcontractor-based performance strategy. *Id.*; *see also* AR 2054 ("MVL's plan did address and mitigate some of these risks, but a major flaw in its proposal was its failure to provide a communication plan with subcontractors.").

AGCO, in contrast to MVL, planned to self-perform most work. The SSA found, after weighing the two proposals, that "AGCO's plan to self-perform the majority of the work is an advantage over MVL's plan to subcontract and supervise." AR 2054.

*2. Supervision by the "Project Manager"*

Along similar lines, the Agency questioned MVL's plan for managing performance across different locations in Kuwait. MVL's proposal described a "Program Management Office" staffed by a "Project Manager" and other personnel. AR 8179. The project manager would be responsible for overseeing superintendents based at site offices established at work locations. AR 8178–79.

The SSEB noted that the project manager would be a "corporate official not based on the job site." AR 2015. That, the SSEB said, represented a weakness because MVL had not presented a plan for communications with the work locations. *Id.* The SSEB questioned whether the project manager would be aware of day-to-day issues at work sites. AR 2015–16. The SSA agreed. AR 2054.

The Agency did not express similar concerns about AGCO's strategy. The SSA believed AGCO had "provided a more detailed Management Plan often exceeding the requirements of the solicitation and providing benefits to the Government that would be an advantage over MVL's proposal." AR 2053.

*3. Work before approval*

Two weaknesses stemmed from the Agency's perception that MVL planned to begin work on task orders before receiving approval. MVL had anticipated, as a potential obstacle to performance, that there would be "[c]ompressed schedules requiring early material procurement and delivery ahead of subcontractor mobilization or long-lead vendor lead times." AR 8201. To anticipate that challenge, MVL said that it "maintains a catalog of pre-approved and historically accepted materials," making it possible to "immediately initiate procurement upon scoping, thereby minimizing waiting periods typically associated with the initial submittal approval cycle." *Id.* MVL said that "[f]or materials known to have volatile availability or longer lead times," it "initiates procurement immediately following the joint scoping meeting, often before NTP [notice to proceed] is issued." *Id.*; *see also* AR 8188 ("MVL begins mobilization planning and access coordination during the joint scoping phase. This includes … sourcing long-lead materials[.]").

The SSEB understood MVL to mean that it planned to "procur[e] previously accepted materials prior to receiving approval by the Government through the required submittal process." AR 2016; *see also id.* ("The offeror made multiple references to beginning work prior to the issuance of the Notice to Proceed (NTP). The offeror also stated that they will incur costs prior to receiving permission from the Government to begin work.") (citations omitted). But the SSEB did not consider that approach satisfactory because materials MVL used on task orders in the past might not be acceptable again: "[T]he prior contracts are standalone and what has met prior specifications may not be acceptable on future task orders." *Id.* Relying on past approvals before approval for a given task order thus creates risks, including "non-conforming materials being purchased, requests for variances, and/or delays caused by long lead items needing to be reordered," or the possibility that "non-compliant work could be performed" and that "directed removal of the noncompliant work" could be necessary. *Id.*

The SSA shared the SSEB's concern that MVL would "complet[e] work or order[] materials before they are authorized," or "begin work before NTP has been issued." AR 2055. That plan, the SSA stated, is not "authorized by the contract and could lead to unauthorized expenditures, rework, delay due to re-ordering items, and general inefficiencies such as requesting scope variances." *Id.*

*4. Non-prepriced items*

Both AGCO and MVL proposed ways to speed up acquisition of non-prepriced items.

AGCO stated that it would bifurcate treatment of such items into "recurring" and "non-recurring" tracks. AR 6284. For recurring items, it would "proactively" submit "three independent supplier quotations" to the contracting officer, negotiate a price, and then treat the new price as a contract modification, "thereby streamlining future task orders." *Id.* AGCO provided examples of how that process had worked in the past. *Id.* For non-recurring items, AGCO described how it would obtain bids and incorporate the price into a given task order. *Id.* The SSEB assigned a strength to AGCO because that plan "formaliz[ed] the pricing into the contract" and would "reduce timelines across the task orders when these items need to be procured again." AR 2010.

MVL's approach seems to have been somewhat different. MVL's plan was to first look for "the most closely related [Unit Price Book] line item" and justify the substitution to the Agency. AR 8202–03. Any such "[Unit Price Book] substitutions … w[ould] be documented in the proposal and subsequently in the task order award or contract modification[.]" AR 8203. If no Unit Price Book substitute exists, and the

price falls below a specified contractual threshold, MVL stated that it would submit "three competitive vendor or subcontractor quotes." *Id.*

The SSA noted that AGCO's plan "[. . .]," which "will simplify negotiation of task orders and decrease price risk." AR 2055. The SSA did not comment on the analogous aspect of MVL's proposal.

**B. Factor 2 – Past Performance**

Although both MVL and AGCO received "substantial confidence" ratings for past performance, the SSEB identified two of MVL's CPARS entries (out of 42 total) mentioning [. . .]. AR 2017. The SSEB treated those entries as substantiating its concerns about MVL's lack of a communications plan. AR 2018. The SSA likewise "determined that MVL's CPARS evaluation history does provide support to the level of risk associated with its management approach." AR 2055.

**C. Factor 3 – Coefficients and Composite Rates**

MVL proposed a lower price than AGCO. The Agency obtained an independent government estimate, which had a bottom-line sum coefficient of [. . .]. AR 2021. The Agency's price analyst also calculated that the average bottom-line coefficient, across all submitted proposals, was [. . .]. *Id.* The analyst then compared those reference points to MVL's and AGCO's coefficients. AGCO's bottom-line sum coefficient was [. . .] lower than the government's estimate and about [. . .] higher than the average. AR 2023. MVL's, though, was almost [. . .] lower than the government's estimate and about [. . .] lower than the average. AR 2031.

The Agency's price analysis expressed concern about both offerors' pricing. The analyst found that MVL's and AGCO's year-to-year escalation rates were unbalanced. AR 2024, 2032. That led the analyst to question whether either MVL or AGCO would be able to complete work to the Agency's standards: "[T]he offeror may not be able to complete all the task orders throughout the life on the contract due to price increases driven by demand or market strategy," or "may inflate the proposals by adding unnecessary pricing data[.]" AR 2024 (AGCO), AR 2032 (MVL).

As to MVL, the analyst appears also to have feared — in "addition[]" to the unbalanced pricing — that the proposal did not [. . .]. AR 2032. "[A]ll pre-priced work under the contract will be performed [. . .]." *Id.* That, according to the analyst, "presents a high risk to the government that the offeror will not be able to complete task orders under this proposed pricing." *Id.*

The SSA shared the analyst's concerns about MVL's low pricing. The SSA downplayed MVL's unbalanced price escalation, saying it "will likely lead to lower prices across all contract years … , while still providing some escalation for the

contractor to account for changed market conditions." AR 2052. But to the SSA, MVL's low overall coefficients implied that MVL "plans to perform task orders for [. . .]." AR 2052.

The SSA underscored the point in the tradeoff analysis:

> … MVL's pricing introduces serious risk regarding its ability to complete task orders [. . .] as it proposes [. . .]. Additionally, I have concerns that MVL's lower coefficients present pricing risks and may indicate an unrealistic bid, or 'buy-in,' where the offeror may cut corners on materials or qualified personnel to maintain profitability, causing project delays. To make up for a low bid, the offeror may actively seek to identify 'unexpected' Non-PrePriced work not listed in the price book, resulting in contentious negotiations and a high volume of change orders that could result in the final cost of a task order being equal to or higher than AGCO's proposal.

AR 2056.

The SSA mentioned the analyst's concerns about AGCO's unbalanced pricing, but found it acceptable in the same terms applied to MVL. AR 2058. The SSA found that AGCO's prices were reasonable based on comparison to the government's estimate and the average of other offerors. AR 2057.

**D. Award**

Based on the just-summarized analysis, the SSA "determined that an award to AGCO represents the best value to the Government":

> AGCO's management approach provides advantages to the Government over MVL's, while MVL's proposal introduces higher risks of unsuccessful performance. The biggest risk is MVL's plan to subcontract significant portions of the work, but not providing a plan for communicating with subcontractors. This risk is elevated when reviewing MVL's prior CPARS ratings that documents [. . .] on prior Government projects. Additionally, while MVL does provide lower proposed coefficients than AGCO, there is significant pricing risk associated with those lower coefficients.

AR 2056.

The SSA acknowledged that AGCO's price was higher than other offerors, but found that "non-priced factors" in AGCO's proposal "are worth paying the higher price for." AR 2058. The SSA accordingly awarded to AGCO a second time. *Id.*

MVL's present complaint follows.

# DISCUSSION

## I. Legal Standards

### A. Jurisdiction and Standing

To reach the merits of the case, I must first determine that the Court has jurisdiction over Plaintiff's claims. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). This Court's jurisdiction in post-award bid protests is derived from the Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, § 12(a)–(b), 110 Stat. 3870, 3874–75 (1996) (codified at 28 U.S.C. § 1491(b)). *See Dyonyx, L.P. v. United States*, 83 Fed. Cl. 460, 464–65 (2008). The Tucker Act now grants this Court "jurisdiction to render judgment on an action by an interested party objecting to ... the award of a contract or any alleged violation of statute or regulation in connection with a procurement[.]" 28 U.S.C. § 1491(b)(1). This Court is empowered under the statute to "award any relief that the court considers proper, including declaratory and injunctive relief[.]" 28 U.S.C. § 1491(b)(2).

Plaintiff must also have standing to challenge the contract award. Plaintiff has Article III standing because it claims an injury — specifically, denial of an award — which is traceable to the allegedly defective procurement process and which could be redressed by this Court. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *see also Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009) ("The Court of Federal Claims, though an Article I court, ... applies the same standing requirements enforced by other federal courts created under Article III.").

To establish that it has statutory standing as an interested party, *see* 28 U.S.C. § 1491(b)(1); *CACI, Inc.-Fed. v. United States*, 67 F.4th 1145, 1151 (Fed. Cir. 2023), a plaintiff must show (1) that it "is an actual or prospective bidder" and (2) that it "possesses the requisite direct economic interest." *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (citing *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369–70 (Fed. Cir. 2002) (itself citing *Lujan*, 504 U.S. at 561)).

Here, there is no dispute that Plaintiff meets the two-part test. First, Plaintiff was an actual bidder that submitted a proposal. AR 8174. Second, Plaintiff has the requisite economic interest: It was one of two offerors subject to re-evaluation during the previous corrective action, AR 1999, 2005–18, and — as discussed further below — it has "a substantial chance of being awarded the contract" if its claims lead the Agency to reconsider its evaluation. *McVey Co., Inc. v. United States*, 111 Fed. Cl. 387, 405 (2013); *see also Weeks Marine*, 575 F.3d at 1359 (quoting *Rex Serv. Corp.*, 448 F.3d at 1308).

**B. Standard of Review**

This Court reviews bid protests "pursuant to the standards set forth in section 706 of title 5," *i.e.*, the Administrative Procedure Act. 28 U.S.C. § 1491(b)(4); *see Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004). The protester must show that the agency's action was arbitrary and capricious and that it was prejudiced by the agency's conduct. *Banknote Corp.*, 356 F.3d at 1350–51; 5 U.S.C. § 706; *see Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005); *Weeks Marine*, 575 F.3d at 1358–59.

There are two bases for setting aside government procurements as arbitrary and capricious: "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001); *Weeks Marine*, 575 F.3d at 1358 (quoting *PGBA, LLC v. United States*, 389 F.3d 1219, 1225 n.4 (Fed. Cir. 2004)); *see also Bannum*, 404 F.3d at 1351; *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057–58 (Fed. Cir. 2000).

The first route involves determining "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Impresa*, 238 F.3d at 1332–33 (quotes omitted) (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)). To succeed, "the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Id.* at 1333 (quotes omitted) (quoting *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C. Cir. 1994) (itself quoting *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973))). The second route requires the disappointed bidder to "show a clear and prejudicial violation of applicable statutes or regulations." *Id.* (quotes omitted) (quoting *Kentron*, 480 F.2d at 1169, and *Latecoere*, 19 F.3d at 1356). In either case, this Court's review is "highly deferential" to agency decision-making, *Advanced Data Concepts*, 216 F.3d at 1058 — especially in an award based on best value, where "the contracting officer ha[s] even greater discretion than if the contract were to have been awarded on the basis of cost alone." *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004); *see also Cleveland Assets, LLC v. United States*, 883 F.3d 1378, 1382 (Fed. Cir. 2018).

"Further, in addition to identifying 'a significant error in the procurement process,' a protestor must show 'that the error prejudiced it.'" *Wis. Physicians Serv. Ins. Corp. v. United States*, 151 Fed. Cl. 22, 32 (2020) (quoting *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996)). Prejudice cannot be presumed. *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 998 (Fed. Cir. 2021). "[T]o establish prejudice, a protester must show that, had it not been for the alleged error

in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract." *Data Gen. Corp.*, 78 F.3d at 1562.

When resolving motions for judgment on the administrative record under Rule 52.1(c), this Court proceeds "as if it were conducting a trial on the record." *Bannum*, 404 F.3d at 1354 (addressing former RCFC 56.1); *see also Young v. United States*, 497 F. App'x 53, 58–59 (Fed. Cir. 2012) (addressing the standard under RCFC 52.1 and citing *Bannum*, 404 F.3d at 1356).

## II. <u>Merits</u>

As mentioned, MVL raises a great many challenges to the procurement process. I conclude that the Agency erred, and prejudiced MVL, by basing its decision on an improper price realism analysis. The remaining issues are either forfeited or substantively insufficient. I further conclude that limited injunctive relief is appropriate.

### A. The Agency erred by evaluating for price realism.

#### *1. Error*

MVL argues that the Agency's evaluation of MVL's coefficients included an improper "realism" analysis. The government essentially concedes as much in its reply, and I agree. Def.'s Reply at 11.

"[P]rice reasonableness generally addresses whether a price is too high, whereas cost realism generally addresses whether a cost estimate is too low." *Agile Def., Inc. v. United States*, 959 F.3d 1379, 1384 (Fed. Cir. 2020) (alteration modified) (quoting *First Enter. v. United States*, 61 Fed. Cl. 109, 123 (2004)). The analyses are different. When a solicitation for a firm-fixed price contract calls for a price reasonableness analysis and does not put offerors on notice that the procuring agency might also consider realism, a realism analysis would apply unstated evaluation criteria and is therefore forbidden. *See, e.g.*, *Ceres Env't Servs., Inc. v. United States*, 97 Fed. Cl. 277, 306 (2011); *UnitedHealth Mil. & Veterans Servs., LLC v. United States*, 132 Fed. Cl. 529, 561 (2017).

Here, the Agency notified offerors that the Solicitation "will result in a Firm-Fixed-Price (FFP) contract." AR 598; *see also* AR 12.[3] The Solicitation expressly called for a reasonableness analysis. AR 995. No party claims that anything in the Solicitation expressly or implicitly authorized the Agency to review for realism. *See*

[3] The Agency added that language to the Solicitation in the sixth amendment and incorporated it into the eighth amendment. *See* AR 598, 912, 974.

*UnitedHealth Mil. & Veterans Servs.*, 132 Fed. Cl. at 554–55 (discussing language that implies a price realism analysis).

But realism considerations pervade the analysis of MVL's pricing. The price analyst's report expressed concern that MVL's proposed coefficients [. . .] were so low that they "present[ed] a high risk to the government that [MVL] will not be able to complete task orders under this proposed pricing." AR 2032. The SSA described MVL's proposal as "an *unrealistic* bid" and [. . .]. AR 2056 (emphasis added). The Agency, in short, criticized MVL's pricing as too low, a consideration it was not permitted to address.

*2. Prejudice*

Because the Agency erred, the next question is whether the improper realism analysis prejudiced MVL. In this case, with a well-developed factual record, showing prejudice means establishing that "but for the error, [MVL] would have had a substantial chance of securing the contract." *Savantage Fin. Servs., Inc. v. United States*, 150 Fed. Cl. 307, 317–18 (2020) (quoting *Oracle America*, 975 F.3d at 1291) (quotes omitted); *see eSimplicity, Inc. v. United States*, 162 Fed. Cl. 372, 381 n.9 (2022). I conclude that standard is met.

On any reading of the record, findings about the risks potentially flowing from MVL's pricing were an important part of the SSA's decision to choose AGCO instead. Both the price analyst and the SSA considered MVL's low price to present a high risk that MVL would not complete the contract. AR 2032, 2056. The government says that the Agency's concerns about MVL's subcontractor communications were the *main* reason for preferring AGCO, *see* Def.'s MJAR at 23–24 (citing AR 2056); Def.'s Reply at 11, but that does not take away from the fact that the Agency's decision rests in part on a forbidden consideration.

Even if the Agency emphasized the communications issue, the realism issue played an important role. The tradeoff between MVL and AGCO was straightforward. The Agency had substantial confidence in both offerors' ability to perform. *See* AR 2011, 2044, 2051; *see also* AR 983 (defining "Substantial Confidence" to mean that "the Government has a high expectation that the offeror will successfully perform the required effort"). The Agency thought AGCO had a better management approach. *See* AR 2005, 2053. But MVL offered a better price.[4] AR 2056. A proper analysis would have focused on whether AGCO's management was worth the price premium, and conversely, on whether MVL's lower price made it the better value. Set up that way, there is a substantial chance the Agency would have chosen MVL. *Cf. VSolvit, LLC*

[4] I set aside, for the moment, other potential errors that might have affected the Agency's evaluations.

*v. United States*, 166 Fed. Cl. 201, 212–13 (2023) (reasoning that a protestor's substantial chance of receiving a contract would increase if an allegedly improper price realism analysis were excluded on re-evaluation).

But the Agency's improper consideration of realism distorted the analysis by turning MVL's advantage into a disadvantage. Because the Agency thought the price created performance risks, MVL's low pricing weighed against it, not for it. In the SSA's own words: "[W]hile MVL does provide lower proposed coefficients than AGCO, there is significant pricing risk associated with those lower coefficients." AR 2056. Turning the tables that way might well have cost MVL its chance of selection, which is adequate to show that MVL was prejudiced by the error. *Ceres Env't Servs.*, 97 Fed. Cl. at 306.

**B. Other arguments fail.**

*1. Several arguments are forfeited*

MVL's Response & Reply raises four arguments that did not appear in its principal brief. The arguments, had they been preserved, vary in strength. They are: (1) that AGCO's proposal was unacceptable because it guaranteed pricing for 90 days rather than the 120 days required by the Solicitation, *compare* AR 6429 (Item 13D), *with* AR 6430 (Item 17); Pl.'s R&R at 7–8;[5] (2) that the Agency improperly incorporated MVL's Factor 2 – Past Performance materials into evaluation of Factor 1 – Management Approach, Pl.'s R&R at 14;[6] (3) that in comparing AGCO's coefficient

[5] If MVL had raised that argument at the proper time, it might have been grounds for remand. *Cf. Camden Shipping Corp. v. United States*, 89 Fed. Cl. 433, 439–42 (2009) (holding that revival of an offer that remained open for less than the required acceptance period would harm the competitive process). The government's response is that because the government accepted AGCO's offer in less than 90 days, the issue is moot. Def.'s Reply at 6–7; Tr. at 113–15. But that misses the economic significance of the guarantee. When an offeror guarantees its pricing for an amount of time, the offeror accepts the risk of upward price fluctuations during that period. That could lead an offeror to propose a higher price. A longer guarantee means more risk than a shorter guarantee, meaning that an offeror who guarantees a price for 90 days could have an advantage over offerors who guarantee the price for 120 days. If that is so, AGCO's violation of the Solicitation's terms could have yielded a systematic advantage over all the offerors that complied. *See Camden Shipping Corp.*, 89 Fed. Cl. at 440. Far from solving the problem, the Agency's acceptance potentially confirms the unfairness of AGCO's offer.

[6] That argument likely would have lacked merit even if presented properly. As MVL's own authority shows, the Agency had discretion to review offer-related materials for any relevant purpose. *In re Apptis, Inc.*, B-299457, 2007 WL 5010845, at *8 (Comp. Gen. May 23, 2007) ("An agency is not precluded from considering an element of a proposal (such as past performance) under more than one evaluation criterion where the element is relevant and reasonably related to each RFP criterion under which it is considered."). Other authorities concur. *See, e.g.*, *DM Petroleum Operations Co. v. United States*, 115 Fed. Cl. 305, 311 (2014) ("Agencies are well within their discretion to consider relevant information under more than one evaluation factor."); *CGS Adm'rs, LLC v. United States*, 110 Fed. Cl. 431, 449 (2013) ("[C]onsidering certain pieces of information relevant to an offeror's proposal for multiple purposes during evaluation proceedings is not impermissible."); *Office Depot, Inc. v. United States*, 95 Fed. Cl. 517, 533 n.18 (2010) ("The general rule is that 'an agency is not precluded from

to the average of other offerors, the SSA used an average coefficient higher than the value reflected on the price analyst's spreadsheet, thus understating how much AGCO's coefficient exceeded the average, *id.* at 24;[7] and (4) that the Agency failed to reconstitute an entirely new SSEB after its original corrective action, *id.* at 13 n.2.[8] But I deem them forfeited, so I do not reach them.

In some circumstances, I have excused a party's late presentation of an argument that was related to theories developed in the principal brief and which the adverse parties had the opportunity to counter. *22nd Century Techs., Inc. v. United States*, 176 Fed. Cl. 389, 398–99 (2025) (considering a new disparate-evaluation argument related to an issue addressed in the principal briefs). Here, though, not only do MVL's new arguments go beyond the issues originally presented, but MVL came up with *four* of them, and the government and AGCO had less than a week to reply. *See* Order (ECF 20) (setting the briefing schedule). It would be unfair to the government and AGCO to consider them. *Metrostar Sys., LLC v. United States*, 180 Fed. Cl. 708, 716 n.5 (2026).

*2. Lack of a communications plan*

The main focus of the parties' briefing is on MVL's argument that the Agency faulted MVL for omitting a "communications plan." MVL says that the Agency applied an unstated evaluation criterion and evaluated MVL and AGCO unequally. Agencies must limit their evaluation of offers to the criteria stated in the solicitation, *eSimplicity, Inc.*, 162 Fed. Cl. at 379, and must apply the same standards to all offerors, *Centerra Security Servs. GmbH v. United States*, 176 Fed. Cl. 219, 236 (2025). But I do not agree that the Agency breached that obligation here.

---

considering an element of a proposal under more than one evaluation criterion where the element is relevant and reasonably related to each criterion under which it is considered.'") (quoting *InnovaTech, Inc.*, B–402415, 2010 WL 1633382, at *4 (Comp. Gen. Apr. 8, 2010)). MVL did preserve a related but separate argument — that the Agency did not review MVL's and AGCO's performance materials evenhandedly — which I will address below.

[7] The government claims that it discovered, when reviewing that argument, that it had included the wrong coefficient calculation spreadsheet in the administrative record. *See* Def.'s 2d Mot. to Correct the Admin. R. at 1–2 (ECF 40). The lower average coefficient appears in a spreadsheet prepared before final offers, and the higher one — used by the SSA — is in the final spreadsheet. I granted the government's motion to supplement the administrative record with the later spreadsheet. *See* Order (ECF 43). MVL questions the Agency's story, *see* Tr. at 7–11, and I would hesitate to reject a plaintiff's argument for judgment on the administrative record based solely on a surprise document submitted after the close of briefing. But because of MVL's forfeiture, the government avoids the consequences of its error.

[8] The parties disagree as to what, exactly, the government agreed to do and whether the Agency met its commitments. Pl.'s R&R at 13 n.2; Def.'s Reply at 9; Tr. at 70–74. The record may lack documents needed to evaluate the parties' respective positions. Because of the forfeiture, I need not sort it out.

At the threshold, it does not appear that the SSA actually required a formal plan in the first place. Everyone agrees that the Solicitation did not call for a formal "communications plan" as such. What the Solicitation *did* demand was a good management approach, which necessarily entails communications among the players. For example, the Solicitation required an organizational chart that "make[s] logical relationships and lines of communication between the contractor and subcontractors." AR 978. It also emphasized that the Agency would evaluate the proposals "to determine the effectiveness of the relationships and workflow" between an offeror and its subcontractors. *Id.* Put another way, if an offeror plans to rely on subcontractors, it behooves the offeror to explain how it will communicate with them.

The SSA's references to the Solicitation calling for a "communications plan" should probably be interpreted in that light. The SSA was concerned that MVL's strategy put a premium on coordination between MVL and its subcontractors, and that MVL did not adequately explain how communication would work. According to the SSA, the lack of a "formal communication plan" between MVL and its subcontractors "introduces the possibility of misunderstood scope, unclear work sequence, missed material and equipment procurements, unclear delegation of tasks, and issues with other aspects of coordination required to successfully execute any task orders." AR 2048. Although some of the SSA's language was inartful and inexact, it is best read as simply saying that MVL could not establish the soundness of its management strategy without more detail about communication. That is a permissible reading of the Solicitation. *See PlanetSpace, Inc. v. United States*, 92 Fed. Cl. 520, 536–37 (2010).

The record appears to rationally bear out the SSA's thinking. MVL's proposal emphasized its subcontractor-driven approach to fulfilling task orders, AR 8189–90, and advertised MVL's deep bench of subcontracting crews that bring flexibility to scheduling and availability, AR 8188. But the proposal gave less attention to mitigating what the Agency considered the chief risk of MVL's approach — that each subcontractor is a separate entity presenting elevated communication and coordination risks. *See, e.g.*, *PlanetSpace, Inc.*, 92 Fed. Cl. at 537; *Davies Rail & Mech. Works, Inc.*, B-278260, 1998 WL 241166, at *8 (Comp. Gen. Feb. 25, 1998). This Court defers to an agency's view that an offeror should have explained its performance strategy in more detail. *See Pac. Eng'g Inc. v. United States*, 178 Fed. Cl. 666, 679 (2025).

The comparison to AGCO, rather than establishing disparate treatment, tends to substantiate the Agency's concern as well. AGCO — which proposed much more limited use of subcontractors — said that its subcontractors would have access to the same communications platform as its own staff. AR 6265. MVL conceded at argument

that its own proposal did not say the same. Tr. at 39–41. The Agency could rationally conclude that the two proposals were distinguishable and that AGCO's was better.

*3. Project management*

Along similar lines, the Agency found that MVL failed to detail how it would supervise work at the job sites. MVL says the Agency's view is irrational and that it evaluated MVL's and AGCO's plans unequally. I do not find that the Agency acted arbitrarily or capriciously.

MVL's main move is to criticize the SSEB and SSA for describing the project manager as a "corporate official not based on the job site." AR 2015, 2054; Pl.'s MJAR at 17–19; Pl.'s R&R at 4–5. I fail to see why that matters. For one thing, it is literally correct in every way. There is no dispute that MVL's project manager would be an employee of MVL (and in that sense a "corporate official"), nor that he would be based at a management office rather than at any of the job sites.

The real issue — which MVL gets around to addressing — is that the Agency questioned whether MVL's project manager would be able to adequately supervise work occurring all over Kuwait, while expressing more confidence in AGCO. AR 2048, 2054. The SSA did not think that MVL had fully explained communications from the "field crew" through the project manager to MVL executives. AR 2054. That, the SSA thought, "creates a risk that the [project manager] will not be fully aware of what is going on at the site and issues raised by the Government will not be properly communicated to the [project manager]." *Id.*

The Agency's judgment, of course, is entitled to deference given "the obvious difficulty of second-guessing [its] view that one offeror has shown understanding of the field while another has not." *Barbaricum LLC v. United States*, 172 Fed. Cl. 186, 197 (2024). This Court's judges are not experts in construction management, so we are not well-placed to overrule the Agency's preference for one plan over another.

As with communications, the proposals give at least some objective support to the Agency's view. Although both proposals relied on a single point of contact for the Agency, *see* AR 6244, 8189, AGCO detailed how its project manager (whom it refers to as a "Contracting Officer") would stay apprised of the day-to-day operations between job sites. AR 6244–45. AGCO further explained in detail how it would use software like "[. . .]" to coordinate all of AGCO's various stakeholders and ensure that the Agency's expectations aligned with the work being produced on the ground. AR 6255–56. MVL points out that its proposal also described centralized oversight and use of [. . .]. AR 8190. But even if the two proposals have some details in common, MVL's shorter explanation could be read as shallower than AGCO's. Because it was not irrational for the Agency to take that view, I cannot substitute my own judgment.

*Barbaricum*, 172 Fed. Cl. at 196 (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)).

*4. MVL's plan to initiate procurement before approval*

The Agency interpreted MVL as proposing to speed up certain tasks by spending money and acquiring materials before receiving a formal notice to proceed. AR 2016, 2049. MVL claims that interpretation was arbitrary and capricious, but in fact it was eminently reasonable.

In its proposal, MVL stated that it would "initiate[] procurement immediately following the joint scoping meeting, often before [the notice to proceed] is issued." AR 8201; *see also* AR 8188. As part of "initiat[ing] procurement," MVL included "sourcing" items from its "catalog" of materials the Agency had accepted before. AR 8201; *see also* AR 8188. It is easy to see how the Agency could interpret that as it did, even if MVL meant something else. But more than that, the Agency's interpretation was the most obvious one: If there is a way to "initiate procurement," as MVL proposed, *without* "begin[ning] work," "ordering materials," or "incur[ring] costs," as the Agency feared, MVL has not explained what it might be. *Compare* AR 8201, *with* AR 2016, 2055. MVL thus cannot show any error in how the Agency interpreted its proposal. *See ActioNet, Inc. v. United States*, No. 19-388C, 2019 WL 2006028, at *8 (Fed. Cl. Apr. 22, 2019) (holding that an agency's alleged misinterpretation of a proposal was not irrational).

*5. Acquisition of non-prepriced items*

Both MVL and AGCO proposed ways to streamline acquisition of "non-prepriced items." *See* AR 6283–84, 8203. The Agency considered AGCO's approach a strength because it mentioned incorporating prices into the contract for future task orders, but not MVL's. AR 2010, 2014–15, 2055. MVL says it proposed the same thing, rendering the two approaches substantively indistinguishable, *see* Pl.'s MJAR at 27; Pl.'s R&R at 11–12, but fails to show that the Agency acted arbitrarily or capriciously.

Whatever MVL's intentions might have been, it is not clear that it meant to handle non-prepriced items in the same way as AGCO. AGCO was explicit that for recurring non-prepriced items, the price it arranged with the Agency would be implemented as a contract modification incorporated into future task orders. AR 6283–84. MVL said, in contrast, that "[Unit Price Book] substitutions" would be "documented … in the task order award or contract modification[.]" AR 8203. But for non-prepriced items where no substitution was possible, MVL's proposal made no mention of a contract modification after settling the price with the Agency. *Id.*

MVL's proposal for streamlining non-prepriced items could thus be read as less inclusive than AGCO's in at least two ways. It does not necessarily apply outside the context of Unit Price Book substitutions. And even for Unit Price Book substitutions, MVL did not specify when the pricing would become a contract modification and when it would only be incorporated in the task order.

MVL argued at the hearing that it also planned to modify the contract the way AGCO did. Tr. at 64. But even if so, its proposal was not as obvious as AGCO's. *See Garrett Elecs., Inc. v. United States*, 163 Fed. Cl. 632, 670–71 (2023) ("[C]larity and certainty are strengths in their own right."). The Agency's reading of the two proposals — and its decision to favor AGCO's — was therefore not arbitrary or capricious.

*6. Identification of AGCO's subcontractors*

The Solicitation required offerors to specifically identify "key subcontractors, defined as those with primary responsibility for a specific trade or those expected to perform 20% or more of the work." AR 977. MVL argues that when AGCO proposed employing subcontractors for particular tasks — namely, HVAC and firefighting work — it failed to identify them. Pl.'s MJAR at 23–24. But at the hearing, MVL conceded that on the very page where AGCO's proposal mentioned the subcontractors, AGCO also cross-referenced the subcontractors' letters of intent. AR 6265; Tr. at 48. At least one of the letters was from a supplier of HVAC and firefighting services. AR 6321.

That leaves MVL to argue as a fallback that AGCO's cross reference was not clear enough, or that there was ambiguity about what roles would be played by certain subcontractors. Tr. at 48. But even if those narrower arguments had been timely presented and preserved, they amount to nothing. The Agency was within its discretion to conclude that by stating subcontractors' anticipated roles and submitting letters of intent, AGCO had described its use of subcontractors and identified them as the Solicitation required.

*7. AGCO coefficient*

MVL argues that the Agency miscalculated AGCO's price coefficient. AGCO's spreadsheet of coefficients included a bottom-line sum of [. . .]. AR 6446. The Agency used that bottom-line sum in its price evaluation and the SSA's decision. AR 2023, 2045. But MVL spotted what it claims is a mathematical mistake: If one adds up all the individual line-item coefficients on the spreadsheet, one gets [. . .], not [. . .]. MVL claims that the difference led the Agency to understate AGCO's price. I find no error, and certainly no prejudice.

It is fairly obvious what happened. For the line items of "New Construction" and "Repair Work" conducted outside normal work hours during the contract's base year and first option year, AGCO proposed coefficients of [. . .]. AR 6446. Those four coefficients (*i.e.*, two coefficients for two years) were each multiplied by a weight factor of 0.1, yielding four weighted line-item coefficients of [. . .]. The bottom-line sum of [. . .], reflecting the total of all the weighted line-item coefficients, is consistent with that figure. But in the four cells where the weighted line-item coefficients appear, the spreadsheet seems to have rounded them up from [. . .] to [. . .]. Four differences of 0.005 each add up to 0.02, accounting for the difference MVL identifies.

The entire issue, in other words, is that the spreadsheet *expresses* the weighted line-item coefficients in round numbers, but *totals* them in unrounded numbers.

Because the spreadsheet totaled the unrounded numbers correctly, MVL is left arguing that the Agency was bound to use the rounded numbers appearing in the line items. *See* Pl.'s MJAR at 33; Pl.'s R&R at 23–24. But MVL presents no authority in support, nor does it identify anything in the Solicitation holding the Agency to a different mathematical convention. A theory that an agency must make its price calculations to a certain number of significant digits, or that it must round numbers even when an offeror has not done so, is self-defeating. As long as an agency follows the terms of a solicitation, acts evenhandedly with respect to different offerors, and does not otherwise act arbitrarily or capriciously, it surely has discretion how to handle round numbers.

Even if the Agency erred, MVL cannot show prejudice. The difference between [. . .] and [. . .] is less than a third of a percent — a rounding error if there ever was one. Such *de minimis* mathematical errors are harmless. *See AECOM Mgmt. Servs., Inc. v. United States*, 147 Fed. Cl. 285, 292–93 (2020).

MVL's main response is that the Agency set [. . .] as a "ceiling" for AGCO and would not have accepted anything higher. Pl.'s MJAR at 34. Under that logic, the 0.02 increase might have swayed the Agency's decision. But leaving aside the implausibility of the Agency assigning so much importance to a *de mimimis* difference, that is not what the Agency said. Rather, the SSA said *before* the original corrective action in this case — that is, in a non-operative and superseded document — that "it would not be a value to the government to pay higher pricing than AGCO's [. . .] Total Bottom Line Sum Coefficient for a lower rated Management Approach or a lower Past Performance confidence rating." AR 1943. If that language were still relevant after the Agency's corrective action, it means only that going *above* AGCO's price premium would not be justified if AGCO's adjectival ratings were *lower*. That does nothing to support MVL's argument.

*8. Reasonableness analysis*

MVL challenges two aspects of the Agency's reasonableness analysis. I conclude that the Agency did not act arbitrarily or capriciously in either respect.

MVL argues that the Agency failed to analyze AGCO's proposal for reasonableness. Pl.'s MJAR at 35–36; Pl.'s R&R at 22–23. The SSA found it reasonable based on two approaches authorized by FAR 15.404-1(b)(2). Although MVL believes there was not enough reasoning in support of that conclusion, the Agency's conclusion was not arbitrary or capricious.

First, the Agency determined that AGCO's price was reasonable based on "[c]omparison of proposed prices received in response to the solicitation." AR 2057; *see* FAR 15.404-1(b)(2)(i). "Normally, adequate price competition establishes a fair and reasonable price." AR 2057; *see* FAR 15.404-1(b)(2)(i). The Agency found that there was adequate price competition here. AR 2057.[9] It then noted that AGCO proposed "the [. . .] lowest proposed Total Bottom Line Sum Coefficient price" — in other words, that AGCO was somewhere between the highest and lowest bid — and reprinted the price analyst's findings that AGCO's coefficients for each contract year were between [. . .] and [. . .] percent higher than the average. *Id.* The obvious inference is that the Agency considered AGCO's proposal reasonably consistent with the range of offers and the average market price established by price competition.

Second, the Agency determined that AGCO's price was reasonable by "[c]omparison of proposed prices with independent Government cost estimates." AR 2057; FAR 15.404-1(b)(2)(v). The Agency found that "AGCO's proposed coefficients were all lower than the [independent government cost estimate], but within a reasonable range no greater than [. . .] lower." AR 2057. AGCO's proposal was thus close to the government's estimate, and in between the government's estimate and the market average.

MVL counters that the Agency should have provided more explanation for why AGCO's price was nonetheless reasonable. Pl.'s R&R at 22. But the basis of the Agency's decision seems plain from how the SSA compared AGCO's price to the government's estimate and the market. There is no basis to demand more explanation. *Alacritech, Inc. v. Intel Corp.*, 966 F.3d 1367, 1370–71 (Fed. Cir. 2020) ("We do not require 'perfect explanations,' and 'we will uphold a decision of less than

[9] That finding is justified by the record. The relevant regulation cross-references FAR 15.403-1(c)(1), which provides that "adequate price competition" exists when "(A) [t]wo or more responsible offerors, competing independently, submit priced offers that satisfy the Government's expressed requirement; (B) [a]ward will be made to the offeror whose proposal represents the best value … where price is a substantial factor in source selection; and (C) [t]here is no finding that the price of the otherwise successful offeror is unreasonable."

ideal clarity if the agency's path may reasonably be discerned.'") (quoting *In re NuVasive, Inc.*, 842 F.3d 1376, 1382–83 (Fed. Cir. 2016) (itself quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974))); *Distributed Sols., Inc. v. United States*, 104 Fed. Cl. 368, 382 (2012).

Separate from the reasonableness of AGCO's price, MVL argues that the Agency failed to evaluate MVL's proposal for reasonableness. Pl.'s MJAR at 36; *see also* Tr. 23–24, 26. MVL offers a plausible reading of the Solicitation, which does seem to say that all proposals should be evaluated for reasonableness. Pl.'s R&R at 21; Tr. 24, 26. But given the Agency's decision that AGCO offered the best value, had a reasonable price, and should be awarded the contract, MVL cannot show prejudice. *See Garrett Elecs.*, 163 Fed. Cl. at 675 (finding no prejudice based on "a minor error that would not have affected the contracting officer's best value determination").

If, on remand, the Agency decides that MVL offers the best value, it will of course be obligated to determine reasonableness before making an award.

*9. Past performance data*

One last argument deserves attention. MVL asserts that the Agency reviewed its past-performance materials unfairly: specifically, that the Agency combed through consistently positive CPARS evaluations to cherry-pick two negative quotations that supported the Agency's concerns about MVL's subcontractor communications, while not applying the same scrutiny to AGCO's evaluations. Pl.'s MJAR at 29. But although the Agency disclosed (in response to one of MVL's post-award questions) exactly which CPARS evaluations it reviewed, AR 2091–92; *see also* AR 2050–51, the evaluations themselves are not in the administrative record. That makes it impossible to know whether MVL is right.

The CPARS evaluations were plainly within the usual scope of the administrative record. *Oak Grove Techs., LLC v. United States*, 156 Fed. Cl. 594, 600 (2021). MVL seems to have considered the CPARS evaluations at least potentially relevant all along. AR 2091–92 (requesting information about which evaluations the agency reviewed); *see also* Pl.'s MJAR at 29 & n.2 (noting that the evaluations were not included in the administrative record). MVL presumably had access to its own evaluations, if not AGCO's. But MVL does not seem to have pressed the Agency to complete the administrative record with those documents. Tr. at 103. Nor did it file a motion to add them.

That leads to some obvious questions. Can MVL pursue an argument for judgment on the administrative record after forgoing the opportunity to complete the administrative record with documents that were undisputedly in existence, relevant,

and yet omitted? Conversely, can the Agency defend its evaluation of documents without including them for this Court's review? Tr. at 66–69, 104–06.

I invited the parties to file supplemental briefs on those subjects. Tr. at 105–06. The government argued that any objections based on absence of documents from the administrative record are untimely and forfeited. *See* Def.'s Ltr. at 1–2. MVL took the opposite view. *See* Pl.'s Ltr. at 7–8. Neither, though, was able to identify authority directly addressing facts like those here.

Because I remand for other reasons, I need not decide which side bears the burden for the government's omission. The Agency is free (though not required) to revisit its evaluation of the offerors' past performance on remand. If the Solicitation leads to more litigation and a new administrative record must be filed, the parties should confer about its contents.

### C. Remedy

The parties disagree as to the proper remedy. MVL seeks a remand, together with an injunction compelling the Agency to re-evaluate the MVL and AGCO proposals and forbidding the Agency to commence performance with AGCO. Pl.'s MJAR at 39–40. The Agency and AGCO argue that MVL is entitled, at most, to bid and proposal costs. Tr. at 116; Def.'s Ltr. at 2; Def.-Intervenor's Notice at 2. I conclude that a limited injunction is warranted.

This Court assesses whether to grant an injunction using the following test:

> Once a plaintiff has succeeded on the merits, in determining whether to grant a permanent injunction, the court considers three factors: (1) whether the plaintiff will suffer irreparable harm if the procurement is not enjoined; (2) whether the harm suffered by the plaintiff, if the procurement action is not enjoined, will outweigh the harm to the government and third parties; and (3) whether granting injunctive relief serves (or is at least not contrary to) the public interest.

*Fed. Acquisition Servs. Team, LLC v. United States*, 124 Fed. Cl. 690, 707–08 (2016) (citing *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009), *PGBA, LLC*, 389 F.3d at 1228–29, and *Supreme Foodservice GmbH v. United States*, 109 Fed. Cl. 369, 383 (2013)).

It is well established that loss of an opportunity to compete fairly for a contract constitutes irreparable harm. *T Square Logistics Servs. Corp. v. United States*, 134 Fed. Cl. 550, 560 (2017) ("[P]laintiff has shown that absent injunctive relief, it will suffer irreparable harm in the form of a lost opportunity to compete for the award at issue."); *RLB Contracting, Inc. v. United States*, 118 Fed. Cl. 750, 761 (2014) ("[I]n the context of a bid protest, the loss of an opportunity to compete for an award for

which a party would not otherwise be disqualified is sufficient injury to warrant injunctive relief."); *PGBA, LLC v. United States*, 57 Fed. Cl. 655, 664 (2003) ("[A] lost opportunity to compete may constitute an irreparable harm[.]"). "[L]oss of potential work and profits from a government contract constitutes irreparable harm" as well. *Myriddian, LLC v. United States*, 165 Fed. Cl. 650, 658 (2023) (quoting *Superior Optical Labs, Inc. v. United States*, 150 Fed. Cl. 681, 695 (2020) (itself quoting *Macaulay-Brown, Inc. v. United States*, 125 Fed. Cl. 591, 606 (2016))).

The government's main argument is based on the balance of harms and the public interest. The contract at issue would be used for, among other purposes, repairing damage dealt by Iran to United States military installations during the recent war. Def.'s MJAR at 28. There is no other contract practicably available for that work. *Id.* The government anticipates that work can and must begin immediately after hostilities abate. That time, the government contends, is "imminent," *id.*, and should not be delayed by an injunction extending the procurement. *Id.*; Tr. at 116. But moving forward with performance under the contract issued to AGCO risks mooting any reconsideration on remand, Tr. at 117–18, leaving costs as MVL's only option.

Those concerns are not trivial. This Court, in addition, must "give due regard to the interests of national defense and national security" when resolving bid protests. *See* 28 U.S.C. § 1491(b)(3); *see also Al Ghanim Combined Grp. Co. Gen. Trad. & Cont. W.L.L. v. United States*, 56 Fed. Cl. 502, 521 (2003). Nonetheless, three considerations overcome the government's position.

First, the government's argument for urgency has been overtaken by recent events. When the government filed its motion for judgment on the administrative record, the United States and Iran had signed a "Memorandum of Understanding … outlining a cease in hostilities and a framework for peace between the countries." Def.'s MJAR at 28. Peace, the government argued, would open the door to the work the Agency was contracting for. Def.'s MJAR at 28. Since then, the Memorandum has been repudiated by both sides and combat has resumed. If the Agency is waiting for peace in order to begin the reconstruction mission, then it no longer appears that it can begin right away.

Second, a long remand might not be necessary. The government represented at oral argument that a remand could not be resolved quickly because of "logistical concerns" with constituting a new SSEB. Tr. at 117; Def.'s Ltr. at 2. But the grounds for remand do not necessarily require a new SSEB at all. The error, rather, is that the SSA's analysis relies on a price realism consideration that was improperly

introduced by the price analyst. Remedying that error on remand, the government says, would be a much simpler matter:

> Re-evaluating the price of MVL and AGCO's proposals would only require the agency to seat a new cost estimator to prepare a new cost report. The cost report would be forwarded to the contracting officer who would perform a new trade-off analysis incorporating the new price report. A new best value determination would be rendered accordingly. The agency could accomplish this within two weeks.

Def.'s Ltr. at 2–3. It therefore seems that the Agency could resolve a remand in relatively short order with a new selection decision that relies on permissible factors and omits the impermissible one.

Third, the Agency has agreed to a voluntary stay, under which it "suspend[ed] issuing non-urgent task orders" to AGCO. *See* Order at 2 (ECF 20). No urgent task orders were issued. Tr. at 118. MVL represents that it would be satisfied with maintaining that status quo during remand. *See* Pl.'s Ltr. at 8.

I therefore conclude that the public interest and the balance of harms support extending the status quo under the voluntary stay. The Agency will be enjoined from issuing non-urgent task orders to AGCO. I do not consider that to prevent the Agency from issuing task orders that must be executed promptly to protect health, safety, or operational readiness of United States forces.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the administrative record (ECF 25) is **GRANTED.** Defendant's and Defendant-Intervenor's cross-motions (ECFs 26 & 34) are **DENIED**. Defendant-Intervenor's original cross-motion (ECF 27) is **DENIED AS MOOT**.

Pursuant to RCFC 52.2, the case is **REMANDED** for 60 days to the Army Corps of Engineers for further proceedings. The Agency is **ORDERED** to proceed with the procurement consistent with this Opinion. The Agency may re-evaluate MVL's and AGCO's proposals, cancel the procurement, start the procurement process over again, or take other action consistent with this Opinion.

It is further **ORDERED** that no later than **September 28, 2026**, the parties shall file either a stipulation of dismissal or a joint status report including the Agency's decisions on remand.

It is further **ORDERED** that if no stipulation of dismissal is filed, the parties shall file a joint status report no later than **October 28, 2026**, proposing further proceedings in this case.

This case shall be **STAYED** pending the Agency's decision.

The Agency is **ENJOINED** from awarding non-urgent task orders until further order of the Court or a joint stipulation of dismissal is filed, whichever comes first. The Agency may issue urgent task orders that must be executed promptly to protect health, safety, or operational readiness of United States forces. The Agency must provide notice to MVL within 24 hours of issuing an urgent task order.

Pursuant to the Court's April 23, 2026, Protective Order (ECF 11), this Opinion has been issued under seal. The transcript of oral argument is under seal as well. The parties shall have two weeks to propose redactions and, accordingly, shall file notice of their proposed redactions no later than **August 13, 2026**. To aid the Court's evaluation of the proposed redactions and in light of the "presumption of public access to judicial records," *Baystate Techs., Inc. v. Bowers*, 283 F. App'x 808, 810 (Fed. Cir. 2008) (per curiam), each party shall file a memorandum explaining why redactions are necessary for each item of information for which a redaction is proposed.

The parties have not yet complied with their obligation to file redacted versions of their own filings. *See* Protective Order ¶ 12. The parties are **ORDERED** to file the required redacted versions by **August 31, 2026**.

The Clerk of Court is directed to serve a certified copy of this opinion on the Agency in the care of the contracting officer.

U.S. Army Corps of Engineers, Mobile District
ATTN: Valerie Murphy, Contracting Officer
P.O. Box 2288
Mobile, AL 36628

**IT IS SO ORDERED**.

s/ Stephen S. Schwartz
STEPHEN S. SCHWARTZ
Judge